UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| PRESIDENT CASINOS, INC., et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| _____ | ) |
| | ) |
| PRESIDENT CASINOS, INC., | ) |
| | ) |
| Individually and as Trustee of that certain | ) |
| President River Boat Casino-Missouri, Inc. | ) |
| Distribution Trust dated December 20, | ) |
| 2006, | ) |
| | ) |
| Plaintiff- Appellant/Cross -Appellee, | ) |
| | ) |
| v. | ) Case No. 4:08CV166 HEA |
| | ) |
| COLUMBIA SUSSEX CORPORATION | ) |
| and WIMAR TAHOE CORPORATION, | ) |
| | ) |
| Defendants-Appellees/Cross-Appellants. | ) |
| | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on the appeal from the December 27, 2007

decision of the Bankruptcy Court granting summary judgment in favor of

Defendants Columbia Sussex Corporation and Wimar Tahoe Corporation

(collectively "Columbia Sussex") on President Casino Inc's ("PCI") breach of

contract claim. This Court heard oral argument on the appeal on April 22, 2009.

Upon consideration of the briefs of the parties, oral argument and the evidence in

the appellate record, this Court enters the following Findings of Fact and

Conclusions of Law.

## FINDINGS OF FACT

Plaintiff PCI was a public holding company that owned several subsidiaries,

one of which is President Riverboat Casino Missouri, Inc. ("PRC-MO"), a Missouri

corporation. PRC-MO owned and operated a riverboat casino in downtown St.

Louis called the President Casino on the Admiral ("President Casino"). On June 20,

2002, PCI and PRC-MO filed for voluntary bankruptcy under Chapter 11 of the

United States Bankruptcy Code. By Order of this Court dated March 12, 2009,

Henry Gusky, in his capacity as Trustee for President Casinos, Inc. Liquidation

Trust and successor Trustee for the President Riverboat Casino-Missouri, Inc.

Distribution Trust, was substituted for the President

Casino as Plaintiff, Appellant, and Cross-Appellee.

Defendants Columbia Sussex and its subsidiary Wimar Tahoe are private

companies owned by William Yung.

After the filing of the bankruptcy petition, PRC-MO continued to operate the

President Casino as a debtor in possession while trying to find a buyer. On August

9, 2004, PRC-MO entered into a stalking horse agreement with Penn National Gaming to sell the stock of PRC-MO to Penn. Following the execution of this agreement, PRC-MO received authority from the Bankruptcy Court to conduct an auction of the stock of PRC-MO to determine whether other parties would offer better terms than those in the Penn Agreement. The Bankruptcy Court approved an auction for the sale of the President Casino scheduled for October 7, 2004.

As part of the auction, on September 30, 2004, PCI and Columbia Sussex entered into an agreement for the purchase of the President Casino ("Purchase Agreement"). The Purchase Agreement provided that the purchase price would be a minimum of $29 million, but the purchase price would automatically increase as the bidding drove the price higher.

At the auction, Columbia Sussex submitted the winning bid in the amount of $57 million, and PCI and Columbia Sussex subsequently amended the Purchase Agreement to change the purchase price accordingly.

The Parties amended the Purchase Agreement again on June 16, 2005 to permit Columbia Sussex additional time to complete the closing of the sale in exchange for additional consideration and additional money in escrow. That amendment brought the purchase price, with adjustments, to a total of $60,268,434 for the President Casino. The Purchase Agreement, as amended, brought the total

amount in escrow to $1.5 million.

The Purchase Agreement included a condition precedent to the closing of the sale, which required that Columbia Sussex have obtained the necessary gaming license from the Missouri Gaming Commission ("MGC"). Specifically, the Purchase Agreement stated:

> The Missouri Gaming Commission (the "Commission") shall have issued without condition all licenses, permits, approvals, consents, authorizations and orders (which shall be Final Orders) as are required in order for Buyer to acquire the Closing Shares and for the Company to lawfully operate the Riverboat Casino following the Closing under the laws and regulations of the State of Missouri, including the gaming license and liquor license described [herein] (the "MGC Approval").

Columbia Sussex agreed that, in order to acquire the gaming license, it would:

> [U]se all commercially reasonable efforts to comply with all requests of the Commission and to obtain the MGC Approval and further agrees not to take any action that could reasonably be expected to impede or delay the issuance by the Commission of the MGC Approval or result in the refusal of the Commission to issue the MGC Approval.

The Purchase Agreement permitted termination:

> [B]y Buyer or Seller upon written notice to the other party at any time prior to the Closing... [if] Closing shall not have occurred on or before August 1, 2005 (or such later date as is mutually agreed to by the parties), by reason of the failure of any condition precedent under Section 4, provided that such failure did not result primarily from the terminating party materially breaching any covenant contained in this Agreement[.]

- 4 -

In accordance with the Purchase Agreement, on November 19, 2004, Columbia Sussex submitted the necessary applications to the MGC. This included applications for a gaming license by Columbia Sussex, Wimar Tahoe, and the President of both of those organizations, William Yung.

The MGC consists of five Commissioners appointed by the Governor and approved by the Missouri Senate. The MGC Commissioners use certain personnel in order to assist them in making determinations on applications for gaming licenses.

First, the MGC has a memorandum of understanding with the Missouri State Highway Patrol to provide state troopers to conduct criminal investigations ("MGC Investigators"). Second, the MGC has an internal staff ("MGC Staff"). The MGC Staff oversees the criminal investigation and conducts its own financial investigation of the applicants. Finally, the MGC Staff compiles all of the information in order to formulate a recommendation of suitability that they present to the MGC Commissioners.

After the MGC Staff transmits its recommendation to the MGC Commissioners, the applicant has a right to a hearing before the MGC Commissioners. At the hearing, the applicant is permitted to present evidence to the MGC Commissioners and to argue for or against the MGC Staff recommendation.

Only the MGC Commissioners themselves have the power to rule on an application.

After Columbia Sussex had submitted its application, the MGC Investigators conducted a seven month investigation into William Yung's application. The MGC Investigators then transmitted their findings to the MGC Staff.

On the basis of the information collected, the MGC Staff had four concerns about Yung's application: (1) certain personal expenses of William Yung appeared on the statements for his corporate credit card; (2) the son of a minority shareholder in William Yung's Greenville, Mississippi casino had been convicted of drunk driving in Florida; (3) there was uncertainty concerning William Yung's primary place of residence in Florida or Kentucky with regard to tax filings; and (4) there was a dispute with the IRS concerning certain tax shelter transactions involving two of William Yung's companies, wherein he had acted on the advice of the national accounting firm of Grant Thornton.

Thereafter, on July 29, 2005, the MGC Staff convened a preliminary, *ex parte* meeting with the MGC Commissioners in which they relayed their concerns about William Yung's application. The Commissioners did not comment on William Yung's application during this meeting. Neither William Yung nor his representatives attended this meeting or presented any evidence to the Commissioners in connection with the meeting. No MGC Staff recommendation

was made at this meeting.

On the basis of their four concerns, the MGC Staff decided that they would recommend to the MGC Commissioners that William Yung's application be denied. However, the MGC Staff Director of Enforcement Stephen Johnson stated that the MGC Staff was willing to receive additional information from Columbia Sussex to clarify the MGC Staff's concerns.

On September 12, 2005, the MGC Staff held a meeting with William Yung to notify him of the MGC Staff's concerns and to permit William Yung an opportunity to explain the information that had caused those concerns. William Yung attended the meeting and answered the MGC Staff's questions regarding his application.

On September 15, 2005, Columbia Sussex provided additional written materials to the MGC Staff to further address the MGC Staff's concerns. Thereafter, however, the MGC Staff informed Columbia Sussex that it still intended to recommend that William Yung's application be denied. The MGC Staff also stated that they were willing to receive additional information and change their recommendation until the time when they presented the recommendation to the MGC Commissioners.

The MGC Staff then scheduled a hearing with the MGC Commissioners on the application for October 26, 2005.

At this hearing, William Yung would have had the opportunity to present his case for approval and explain or refute the information that formed the basis for the MGC Staff's concerns.

On October 24, 2005, two days prior to the scheduled hearing with the MGC Commissioners, Columbia Sussex sent a letter to the MGC, withdrawing its application. Because of this withdrawal, the hearing before the MGC Commissioners was never held, the MGC Staff never transmitted its recommendation to the MGC Commissioners, and the MGC Commissioners never ruled on William Yung's application.

That same day, October 24, 2005, Columbia Sussex sent a letter to PCI, informing PCI that it was withdrawing its application to the MGC because it had determined that future efforts with the MGC to obtain a license would be futile and because it had been advised by gaming counsel in all the other jurisdictions where it owned casinos that a denial in Missouri would jeopardize its licenses in those other jurisdictions.

At that time, Columbia Sussex had gaming licenses in Mississippi, Nevada and Louisiana. It also had applications pending in Indiana and New Jersey. Contrary to Columbia Sussex's representation in its letter to PCI, gaming counsel in all the other states where Columbia Sussex had licenses had not advised Columbia

Sussex that a denial in Missouri would be fatal to the status of its licenses there.

However, these counsel did advise Columbia Sussex that in the event of either a

withdrawal of the application or a denial thereof, Columbia Sussex would have to

report the underlying reasons to those other jurisdictions.

Specifically, gaming counsel in Nevada stated:

I told defendant's counsel that Nevada would still want to see
what the underlying issues were for either the denial or the
withdrawal, but that I didn't think it would have a major effect
unless there was something that, you know, one of the underlying
issues was — was really problematic, that Missouri's actions would
not likely have an effect, a negative affect on their licensing status
in Nevada.

Gaming counsel in Mississippi stated:

I mean the Mississippi Gaming Commission . . . is not — not too
worried about Missouri or Illinois. However, the denial would be
reviewed . . . by the Mississippi Gaming Commission and other
jurisdictions. . . . I told him that the reason for the withdrawal, if
that were apparent, would be looked at by Mississippi either at that
time or at the time of a subsequent license renewal of one of their
operations in Mississippi.

Columbia Sussex also received a brief email from Louisiana gaming counsel,

Kelly Duncan.  Duncan stated that there was a provision of Louisiana law that was

cause for concern about the status of Columbia Sussex's licenses there, but the

applicability of that provision to Columbia Sussex's circumstances was "not entirely

clear."  The email concluded that, while there should be "further discussion," the

"revocation of a license rarely occurs."

After withdrawing its application from the MGC, Columbia Sussex reported the reasons behind the withdrawal to other jurisdictions in which it had licenses, namely Mississippi, Nevada and Louisiana. None of those jurisdictions took any adverse action with respect to Columbia Sussex's licenses.

The concerns of the MGC Staff forming the basis for Columbia Sussex's withdrawal of its application were also reported to jurisdictions in which Columbia Sussex had applications for licenses pending, namely New Jersey and Indiana. New Jersey and Indiana approved the licenses.

After its repudiation of the contract to purchase the President Casino, Columbia Sussex started the process to purchase another riverboat casino called the Casino Queen across the river from the President Casino in Illinois. The agreement that Columbia Sussex later entered into for the purchase of the Casino Queen contained the following provision permitting termination if:

> in the reasonable judgment of [a party]. . . any Governmental
> Entity has expressed its intent or otherwise provided indication that
> there is a reasonable likelihood that such Governmental Entity will
> not issue. . . any such. . . Gaming Approvals [.]

William Yung stated that the reason for the inclusion of this provision in the Casino Queen agreement was to avoid the situation that Columbia Sussex had

encountered with the President Casino. More specifically, William Yung stated "I can say that we probably learned from the [President]. I don't think there's anything specifically saying the same thing like that in the [President's] contract."

After Columbia Sussex terminated the Purchase Agreement, PCI was forced to obtain an order from the Bankruptcy Court to engage in a new sale and bidding process for the sale of the President Casino. As part of this process, PCI engaged in extensive efforts to market and sell the President Casino to various purchasers. The highest and best offer came from Pinnacle Entertainment, Inc. ("Pinnacle") in the amount of $31.5 million.

On February 24, 2006, PCI entered into an agreement with Pinnacle for the purchase of the President Casino. The sale price agreed upon was $31.5 million.

The Bankruptcy Court approved the sale to Pinnacle on December 4, 2006. The closing of the sale of President Casino to Pinnacle occurred on December 20, 2006.

On October 10, 2006, in a separate transaction, unrelated to the purchase of President Casino, Pinnacle waived payment of five million dollars and deferred payment on another five million dollars of the approximately $60 million in bond debt that it had purchased from PRC-MO. Pinnacle representative John Godfrey

stated in his deposition that these transactions were separate from, and unrelated to, the transaction to purchase the President Casino itself.

On January 12, 2006, PCI filed an adversary proceeding in the Bankruptcy Court for the Eastern District of Missouri alleging, inter alia, breach of contract ("Count I").

On March 22, 2006, Columbia Sussex filed a counterclaim alleging breach of contract for PCI's failure to return Columbia Sussex's escrow deposit.

The parties cross-moved for summary judgment on all claims. On December 27, 2007 the Bankruptcy Court denied PCI's motion for summary judgment on its breach of contract claim, and granted Columbia Sussex's motion for summary judgment on that same claim. The Bankruptcy Court also granted Columbia Sussex's motion for summary judgment on its counterclaim regarding the escrow deposit. The Bankruptcy Court held that in order for PCI to be successful on its breach of contract claim it bears the burden of showing that, "but for" Columbia Sussex's withdrawal of its gaming license application, the MGC Commissioners would have granted the license. The Bankruptcy Court then went on to hold that PCI would be unable to meet this burden because it is inherently speculative to attempt to predict how a regulatory body would rule in a given case.

Despite this, the Bankruptcy Court ultimately held that Columbia Sussex had

established that the MGC Commissioners would have denied the license.

The Bankruptcy Court based this holding on statistics that the MGC Commissioners

usually follow an MGC Staff recommendation.

Finally, the Bankruptcy Court concluded that Columbia Sussex was entitled

to a return of its escrow deposit in the amount of $1.5 million because Columbia

Sussex had validly terminated the contract.

On January 7, 2008, PCI filed a notice of appeal in this Court appealing the

Bankruptcy Court's grant of summary judgment for Columbia Sussex on PCI's

breach of contract claim and on Columbia Sussex's counterclaim for return of the

escrow deposit.

## CONCLUSIONS OF LAW

This Court has jurisdiction over the present appeal from the Bankruptcy Court

pursuant to 28 U.S.C. § 158(a)(1). The Court reviews the Bankruptcy Court's grant

of summary judgment in Defendants' favor *de novo*. *In re Temporomandibular

Joint Implants Prods. Liab. Litig*., 113 F.3d 1484, 1492 (8th Cir. 1997). A grant of

summary judgment will be upheld if (1) there are no

genuine issues of material fact; and (2) the movant is entitled to judgment as a

matter of law. *Id.* In making this determination, this Court views the facts in the

light most favorable to the party against whom the judgment was entered. *Id.*

Under Missouri law, the elements for a breach of contract are: "(1) the existence of an enforceable contract between the parties to the action; (2) mutual obligations have arisen under the contract terms; (3) defendant has not performed its obligations imposed by the contract; and (4) plaintiff was thereby damaged." *Superior Insurance Com. v. Universal Underwriters Insurance Company*, 62 S.W.3d 110 (Mo. Ct. App. 2001).

Under Missouri law, one who hinders performance by the other party may not avail himself of the nonperformance which he induced or occasioned. See 17A C.J.S. Contracts s 468, p. 645, wherein it is stated: "* * * and, where he prevents, hinders, or renders impossible, the fulfillment of a condition precedent or its performance by the adverse party, or is himself the cause of failure to perform the condition, he cannot rely on such condition to defeat his liability." *Hillis v. Blanchard,* 433 S.W.2d 276, 279 (Mo. 1968).

It long has been held that if the occurrence of an event which triggers the discharge of a promissor's obligation is caused by the promissor's culpable misconduct, the legal duty will not be discharged. *Nodland v. Chirpich,* 307 Minn. 360, 365-66, 240 N.W.2d 513, 516 (1976); *accord Restatement (Second) of Contracts* § 230(2)(a); 5 *Williston on Contracts* § 677, at 224-25 (W. Jaeger, ed., 3d ed. 1961) ("It is a principle of fundamental justice that if a promissor is himself the cause of failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure."). At heart the prevention doctrine, as it has been called, *Shear v. National Rifle Association,* 606 F.2d 1251, 1254-

55 (D.C.Cir.1979), is merely a corollary to the general principle that equity will not permit one to rely on one's own misconduct. *Deitrick v. Greaney,* 309 U.S. 190, 196, 60 S.Ct. 480, 483, 84 L.Ed. 694 (1940).

     A court sitting in bankruptcy applies equitable principles, *Pepper v. Litton,* 308 U.S. 295, 303-04, 60 S.Ct. 238, 243-44, 84 L.Ed. 281 (1939), and indeed, courts have recognized the applicability of the prevention doctrine to bankruptcy cases. In *Christensen v. Felton,* 322 F.2d 323 (9th Cir.1963), the court ruled as error the trial court's decision to disallow creditors' claims based on a bankruptcy discharge provision in a contract. *Christensen* involved the sale of a corporation's stock. The terms of the agreement between the shareholders and the purchaser were set out in a written contract which contained a provision discharging the purchaser from its obligation to pay the balance due to the shareholders if either the purchased corporation or the purchaser entered into bankruptcy. *Id.* at 325. Within about a year of the transaction both became bankrupt. The creditors, invoking the prevention doctrine to overcome the bar of the discharge provision, presented evidence that the purchaser had "systematically looted the assets" of the purchased corporation, and that at the time of the transaction the purchased corporation's assets were more than twice its liabilities, but upon bankruptcy one year later it was "hopelessly insolvent." *Id.* at 326. The court stated:

     The testimony shows that to sustain the application of the contract which the referee adopted would permit the bankrupt to profit by its own wrong by wrecking the purchased corporation and diverting to its own use much of those assets, these being what gave the stock value and, having done so, to say to the selling stockholders: "Your company is now bankrupt, as are we, and you have agreed that under these conditions we need not pay you."

*Id.* at 327. The court held that the bankruptcies were caused by the purchaser's culpable misconduct, and that such culpable misconduct prevented the trustee, as successor to the bankrupt, from relying on the discharge provision. *Id.*

*In re Stevenson Associates, Inc.* 777 F.2d 415, 419 -420 (8th Cir. 1985).

In order for the Prevention Doctrine to apply, the plaintiff need only prove that the conduct of the defendant materially contributed to the failure of the condition, and need not establish that the condition would have been satisfied but for the defendant's conduct. *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000).

The question presented in here, therefore, is whether, under the Prevention Doctrine, Columbia Sussex's withdrawal of William Yung's application before the MGC Commissioners ruled on it estops Columbia Sussex from relying on the failure of that provision to excuse its nonperformance under the contract.

In the present case, Columbia Sussex's withdrawal of the application to the MGC breached an express obligation under the Purchase Agreement "not to take any action that could reasonably be expected to impede or delay the issuance... of MGC approval," because the withdrawal of the application prior to a hearing rendered it impossible for the MGC Commissioners to issue that approval. See *Holbrook v. Lane*, 03A01-9401-CH-00050, 1994 WL 287430, at *35 (Tenn. Ct. App. June 30, 1994) (concluding that withdrawal of franchise application before a final determination breached an obligation to use best efforts to obtain approval of the application, because withdrawal rendered approval "impossible"). In addition, the withdrawal breached Columbia Sussex's obligation to use all "commercially

reasonable efforts.. .to obtain the MGC Approval."

Courts in other jurisdictions that have confronted analogous circumstances have concluded that when a party withdraws its application to a board or agency before a final determination can be made on that application, it has acted in a way that hinders the condition precedent requiring approval of that board or agency. Thus, the defendants in those cases were not permitted to rely on the failure of the condition as a basis to terminate their contracts. *Vanadium Corp. of Am. v. Fidelity & Deposit Co. of Md.*, 159 F.2d 105, 108 (2d Cir. 1947) (defendant's withdrawal of its application for approval of a contract to Secretary of the Interior constituted a breach of the condition such that defendant's performance under the contract became due); *Holbrook*, 1994 WL 287430 at *35 (defendant's withdrawal of its application for approval of its franchise before a determination rendered the fulfillment of a condition precedent requiring approval impossible and created a right to damages); *AquaSource, Inc. v. Wind Dance Farm, Inc.*, 833 N.E.2d 535, 541 (Md. Ct. App. 2005) (party's failure to submit a contract to board of directors for approval did not permit it to escape liability for breach of contract on the basis of the failure of a condition precedent requiring board approval). Neither party in this case has cited a decision to the contrary.

*AquaSource, Inc.*, 833 N.E.2d at 539-41, is particularly instructive here. In

*AquaSource*, the contract required that it be submitted to AquaSource's board of directors for approval. *Id*. at 536. Prior to submitting the contract to the board for approval, however, AquaSource's rates and regulatory affairs department determined that the contract did not meet the criteria necessary for board approval. *Id*. at 537. AquaSource terminated the contract, indicating that the condition precedent had failed. *Id*. The Court concluded that AquaSource was under an obligation at least to submit its contract to the board itself for consideration. Significantly, it rejected AquaSource's argument that consideration by the rates and regulatory affairs department was the equivalent of consideration by the board. *Id*. at 540. Therefore, the court concluded that AquaSource had breached its obligation to facilitate the condition precedent and that the non-breaching party, Wind Dance, was entitled to damages as a result. *Id*. at 541.

This Court agrees with the reasoning of these cases. The action of Columbia Sussex in withdrawing the application *in fact* materially contributed to the failure of the condition precedent, i.e., the failure of the MGC Commissioners to issue a gaming license to Columbia Sussex. Thus it is that Columbia Sussex is estopped from relying on the failure to acquire that license as an excuse not to purchase the President Casino, and its failure to do so is a breach of contract.

Columbia Sussex argues that the Prevention Doctrine does not apply when

there is no finding of bad faith by the defendant, or at least a breach by the defendant of its obligation of good faith and fair dealing.

Many of the cases that apply the Prevention Doctrine question the good faith of the party that has rendered the occurrence of a condition precedent impossible. See, e.g., *Vanadium Corp. of Am.*, 159 F.2d at 108; *AquaSource, Inc.*, 833 N.E.2d at 539-41; *Holbrook*, 1994 WL 287430, at *2..3; *Jacobs v. Freeman*, 163 Cal Rptr. 680,682,686-87 (Cal Ct. App. 1980). However, none of those cases stand for the proposition that a finding of bad faith is essential to engage the Prevention Doctrine.

In any event, there is ample evidence in the record to support a finding that Columbia Sussex acted culpably when it withdrew William Yung's application. The record is undisputed that, contrary to the representations contained in Columbia Sussex's letter of October 24,2005, it had not been advised by gaming counsel in all other jurisdictions where it owned casinos that a denial of the application in Missouri would jeopardize its licenses in those other jurisdictions.

In addition, under the Prevention Doctrine, the obligation of good faith and fair dealing is only determined in relation to a defendant's conduct when the contract itself does not contain an express obligation to facilitate the occurrence of the condition precedent. Restatement (Second) of Contracts § 245, cmt. a (1981) (noting that the Prevention Doctrine applies either where the defendant's "lack of

cooperation" breaches a duty imposed by the terms of the agreement or "by a term supplied by the court"). In the present case, Columbia Sussex specifically undertook not to "impede or delay the issuance" of MGC approval, and withdrawing the application before the MGC Commissioners could rule on it was a clear violation of that obligation.

As stated above, under Missouri law, the Prevention Doctrine acts as an estoppel. Once the plaintiff has established that the defendant's conduct has materially contributed to the failure of the condition precedent, the defendant is estopped from relying on that failure to excuse its performance. See *Hillis v. Blonchard*, 433 S.W.2d 276,279 (Mo. 1968).

However, the Court notes that in some jurisdictions the breaching party is afforded the opportunity to avoid liability if it can prove by a preponderance of the evidence that the condition would have failed in the absence of its conduct See, e.g., *Holbrook*, 1994 WL 287430, at *4.5; *Jacobs v. Tenneco West, Inc.*, 231 Cal Rptr. 351, 353 (Cal Ct. App. 1986). Under that formulation of the Prevention Doctrine, PCI is not required to show that the MGC Commissioners would have issued the license but for Columbia Sussex's conduct. Rather, Columbia Sussex bears the burden of proving that the MGC Commissioners would not have issued the license. *Jacobs*, 231 Cal Rptr. at 353 (noting that burden to show condition would not have

occurred is placed on the breaching party). However, this is a burden that Columbia

Sussex cannot carry because, as the Bankruptcy

Court corrected concluded, under Missouri law it is inherently speculative to

attempt to prove how an administrative agency would rule on a given issue. *City of

St Louis v. Riverside Waste Mgmt.*, 73 S.W.3d 794,805-06 (Mo. Ct. App. 2002)

("What...a regulatory body with discretion to approve or disapprove an

application[,] might do under the circumstances presented is inherently

speculative."). Saddling Columbia Sussex with a burden it cannot carry is not unfair

because it was Columbia Sussex's own conduct in withdrawing the application that

has rendered it impossible to know how the MGC Commissioners would have ruled

on the license application.

　　　Further, the expert evidence adduced by Columbia Sussex in an effort to

show how the MGC Commissioners might have ruled if the application had not

been withdrawn is inadmissible as a matter of law. Virtually all of the evidence

submitted by Columbia Sussex purported to establish how the MGC Commissioners

would have ruled by reference to how often in past cases the MGC Commissioners

had followed the MGC Staff's recommendations. Under controlling Eighth Circuit

precedent, testimony which purports to predict how an adjudicatory body would

rule based on statistics gleaned from prior different proceedings is inadmissible.

*Justice v. Carter*, 972 F.2d 951, 957 (8th Cir. 1992) ("[T]he question of what a particular judge would have decided, at best a game of chance based upon a study of the probabilities, has no place in the jury's determination.").   In sum, Columbia Sussex's conduct in withdrawing its application before the MGC Commissioners had the opportunity to rule on it resulted in the failure of the condition precedent. Accordingly, Columbia Sussex is estopped from relying on the failure of the condition to refuse to purchase the President Casino and is liable for breach of contract.

The appropriate measure of damages in this case is the difference between the contract price and the market price "as of the date the contract should have closed." *Contract Freighters v. J.B. Hunt Transp., Inc.*, 245 F.3d 660, 664 (8th Cir. 2001). Where the resale of the asset occurs within a reasonable time after the breach, the resale price is evidence of the market price.  *Id*.  Under Missouri law, as much as 11 ½ months has been held to be a reasonable time after the breach.  *Id*.

In the present case, Columbia Sussex breached the contract on October 24, 2005.  PCI entered into a purchase agreement with Pinnacle four months later on February 24, 2006. This time interval is well within that which Missouri courts have accepted as a "reasonable time" such that the resale price is the appropriate measure of the market price.  Therefore, the resale price to Pinnacle of $31.5 million is the

measure for the market price in the present case.  In the present case the contract

price under the Purchase Agreement with Columbia Sussex was $60,268,434 and

the resale price under the agreement with Pinnacle was $31.5 million.  Therefore,

PCI's damages for breach of contract are the difference between these two amounts

or $28,768,434.

Subsequent to Pinnacle's entering into the purchase agreement for the

President Casino, Pinnacle purchased approximately $60 million dollars in bond

debt in PRC-MO.  Thereafter, in October, 2006, Pinnacle forgave $5 million and

deferred payment on $5 million of that bond debt.  Columbia Sussex argues that this

$10 million in waived and deferred bond debt should be deducted from the amount

of damages for breach of contract.  However, the undisputed evidence shows that

these were entirely separate and unrelated transactions.

Therefore, those transactions are irrelevant to the amount of damages.

Columbia Sussex also argues that any income derived by PCI for the

operation of the President Casino from the time of breach to the time of the closing

of the sale to Pinnacle should be deducted from the amount of damages.

Under Missouri law, however, when the non-breaching party derives income from

an asset from the time of breach to the time of resale, that income may be deducted

from the amount of prejudgment interest from the time of breach to the time of

resale. *Contract Freighters*, 245 F.3d at 665-64.  The rationale for this adjustment is that prejudgment interest is meant to compensate the non-breaching party for the use of the money that it would have had if the contract had not been breached. *Contract Freighters*, 245 F3d at 664-65.  Thus, the non-breaching party should not retain both income derived from the use of the asset and prejudgment interest.  See *id*.  However, the income derived from the use of the asset has no effect on the quantum of damages owed.  Therefore, any income from the President Casino from the time of breach to the time of resale has no impact on the $28.7 million of contract damages.

Also, because, as concluded above, Columbia Sussex wrongfully terminated the Purchase Agreement it is not entitled to a return of its escrow deposit of $1.5 million.

Under Missouri law, Mo. Rev. Stat. § 408.020 (2009), PCI is also entitled to prejudgment interest at a statutory rate of 9 percent per annum from the date of breach until the date of judgment.  Interest is calculated on the entire contract price until the time of resale. *Contract Freighters*, 245 F.3d at 665.  After the date of resale, interest is calculated on the difference between the contract price and the resale price. *Id*.

Accordingly, PCI is entitled to $12,610,675.36 in prejudgment interest, which

is the sum $6,252,850.11 in prejudgment interest from the time of breach to the time of resale and $6,357,825.25 in prejudgment interest from the time of resale.

To the extent that Columbia Sussex seeks to reduce prejudgment interest from the time of breach to the time of resale by any income that PCI earned during that period, it bears the burden of proving that amount. See *Cornejo v. Crawford County*, 153 S.W.3d 898, 904 (Mo. Ct. App. 2005) ("[Breaching party] had the opportunity to present 'affidavits, depositions, answers to interrogatories, or admissions on file' to demonstrate the existence of a genuine fact related to the issue of damages."). This evidence was not developed in the Bankruptcy Court and the parties should be given the opportunity to do so. On remand, therefore, the parties shall submit evidence in support of their respective positions as to the income, if any, PCI earned during the period between the breach and the time of resale.

PCI is entitled to $28,768,434.76 in damages and $13,516,881.22 in prejudgment interest for a total of $42,285,315.98 subject to any reduction for income earned as herein stated.

## CONCLUSION

Based upon the foregoing, the decision of the Bankruptcy Court is reversed.
Accordingly,

**IT IS HEREBY ORDERED** that decision of the Bankruptcy Court on the breach of contract claim of PCI in favor of Columbia Sussex and against PCI is reversed.

**IT IS FURTHER ORDERED** that decision of the Bankruptcy court on Columbia Sussex's cross claim in favor of Columbia Sussex and against PCI is reversed.

**IT IS FURTHER ORDERED** that this matter is remanded to the Bankruptcy Court for determination of the amount of the reduction in the amount of prejudgement interest, if any, in consideration of income PCI received between the time of the breach and the resale of the President Casino.

Dated this 24th day of September, 2009.


_____
   HENRY EDWARD AUTREY
   UNITED STATES DISTRICT JUDGE