UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re:                                                    )
                                                          )
PRESIDENT CASINOS, INC., et al.,                          )
                                                          )
    Debtors.                                            )
                                                          )
_____                 )
                                                          )
PRESIDENT CASINOS, INC.,                                  )
                                                          )
Individually and as Trustee of that certain              )
President River Boat Casino-Missouri, Inc.               )
Distribution Trust dated December 20,                     )
2006,                                                     )
                                                          )
    Plaintiff- Appellant/Cross-Appellee,                )
                                                          )
    v.                                                  )  Case No. 4:08CV166 HEA
                                                          )
COLUMBIA SUSSEX CORPORATION                               )
and WIMAR TAHOE CORPORATION,                              )
                                                          )
    Defendants-Appellees/Cross-Appellants.              )
                                                          )

**OPINION, MEMORANDUM AND ORDER**

    This matter is before the Court on the appeal from the January 25, 2006 and

February 16, 2006 orders of the Bankruptcy Court granting a temporary restraining

order and a preliminary injunction, respectively, to President Casinos, Inc., ("PCI").

The Court heard oral argument on the appeal on April 22, 2009.

Upon consideration of the briefs of the parties, oral argument and the evidence in the appellate record, this Court enters the following Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

PCI is a public holding company that owns several subsidiaries, one of which is President Riverboat Casino Missouri Inc. ("PRC-MO"), a Missouri corporation. PRC-MO owned and operated a riverboat casino in downtown St. Louis called the President Casino on the Admiral ("President Casino"). On June 20, 2002, PCI and PRC-MO filed for voluntary bankruptcy under Chapter 11 of the United States Bankruptcy Code. By order of this Court, dated March 12, 2009, Henry Gusky, in his capacity as Trustee for President Casinos, Inc. Liquidation Trust and successor Trustee for the President Casino-Missouri Inc. Distribution Trust, was substituted for PCI as Plaintiff, Appellant and Cross-Appellee.

Defendant Columbia Sussex Corporation and its subsidiary, Defendant Wimar Tahoe Corporation (collectively "Columbia Sussex") are wholly owned by William Yung.

Between 1994 and December 16, 2005, President Casino patrons parked their vehicles at a parking facility (the "Cherrick Lot"), pursuant to a validation arrangement with the Cherrick Lot operator, St. Louis Parking ("STL Parking"). In

1994, STL Parking charged the President Casino $1.00 for each parking ticket validated by the President Casino.  The parking validation rate was subsequently raised to $1.25 and, in August 2001, to $1.50 per ticket.

Since January 2001, President Casino patrons have parked approximately 40,753 vehicles per month at the Cherrick Lot, totaling over 2.4 million cars a year. Almost 77% of President Casino patrons who park their own vehicles used the Cherrick Lot.

On September 30, 2004, Columbia Sussex entered into an agreement to purchase the President Casino ("Purchase Agreement").  Columbia Sussex knew that the Cherrick Lot was critical for the survival of the President Casino. Therefore, in October 2004, in connection with its purchase of the President Casino, Columbia Sussex purchased the Cherrick Lot for $5 million.

In 2004, the Cherrick Lot earned approximately half a million dollars a year in rental income by parking validated cars at the rate of $1.50.

After Columbia Sussex's purchase of the Cherrick Lot, STL Parking continued to operate the Cherrick Lot, parking cars for President Casino patrons at $1.50 per validated ticket.

In October 2005, Columbia Sussex informed PCI that Columbia Sussex was terminating the contract to purchase the President Casino.  On October 17, 2005,

PCI informed Columbia Sussex that PCI intended to pursue an action for breach of contract if Columbia Sussex did not comply with its obligations under the Purchase Agreement. The parties subsequently entered into settlement negotiations. While the parties were in the midst of settlement negotiations, Columbia Sussex President William Yung, informed PCI's CEO, John Aylsworth that if PCI did not withdraw its threat to bring a breach of contract suit he would "just take that parking lot away and chain it up."

Aylsworth informed William Yung that taking the Cherrick Lot away would end all settlement negotiations.

At 4:35 p.m., on December 16,2005, Columbia Sussex faxed a letter to President Casino stating that effective at midnight, the rate per validated vehicle would increase, 300 percent from $1.50 to $6.00. Columbia Sussex was unable to articulate the method used to calculate the amount of rate increase.

Although Columbia Sussex's own expert Joseph Mollish opined that a comparative study of validated parking rates in the area is a common method to determine whether rates are undermarket and how much to increase rates, Columbia Sussex did not conduct any research or studies to determine whether the price of $1.50 per validated ticket was under market. At that time, other garages in the Cherrick Lot vicinity charged between $1.33 and $2.00 per validated ticket. In fact,

STL Parking advised Columbia Sussex not to raise rates as high as $6.00. The rate increase ended all settlement negotiations between the parties.

The President Casino paid the increased rate of $6.00 because it was difficult to find alternative parking arrangements on such short notice. Between December 16, 2005 and December 22, 2005, the President Casino paid $106,766 more in validation fees due to the increased rates.

On December 22, 2005, five days after raising rates from $1.50 to $6.00, Columbia Sussex faxed another letter to President Casino stating that effective midnight, the rate per validated vehicle would increase another 260 percent, from $6.00 to $10.00. Once again, Columbia Sussex conducted no research on the market rates for validated parking in the Cherrick Lot area. As in the case of the first rate increase, Columbia Sussex was unable to articulate the basis for its decision to raise validation rates 260 percent in five days. Columbia Sussex's expert, Mr. Mollish opined that before determining whether a rate increase has been successful, a parking lot operator must wait at least 30 to 60 days. However, Columbia Sussex waited a mere five days before raising rates again from $6.00 to $10.00.

After the second rate increase, the President Casino continued to validate cars at the Cherrick Lot but refused to pay its weekly invoices at the increased rates. On

December 30, 2005, Columbia Sussex posted a sign outside the Cherrick Lot stating that it would no longer accept validations from the President Casino.

During the month of January 2006, when the President Casino was no longer validating cars at the Cherrick Lot, the number of vehicles using the Cherrick Lot dropped from 40,000 to 645.

Between December 31, 2005 and February 8, 2005, the President Casino paid $276,118 in valet and shuttle services for its patrons who were unable to use the Cherrick Lot and were forced to park further away. President Casino patrons were also forced to park at inconvenient and dangerous locations, such as the levee on the Mississippi River. Parking on the levee, with its cobblestones and steep grade, is unpleasant and potentially unsafe, especially for older patrons. In addition, the levee parking can become instantly unusable in inclement weather when the cobblestones become slick. As river levels rise in the early spring, the space available for levee parking can decrease significantly and may disappear entirely.

On January 12, 2006, PCI filed an adversary action in the Bankruptcy Court for the Eastern District of Missouri, alleging three causes of action: (1) breach of contract based on Columbia Sussex's failure to purchase the President Casino; (2) prima facie tort claim based on Columbia Sussex's raising of the validated parking

rates for the Cherrick Lot; and (3) injunctive relief pursuant to 11 U.S.C. § 105, enjoining Columbia Sussex from blocking access to the Cherrick Lot by casino patrons and from raising the validation parking fee over $1.50. On January 25, 2006, the Bankruptcy Court entered a temporary restraining order granting the requested injunctive relief to PCI.

On January 26, 2006, Columbia Sussex applied to this Court for a Writ of Prohibition, seeking a determination that the Bankruptcy Court did not have subject matter jurisdiction to grant injunctive relief that prohibited Columbia Sussex from using its property, prior to a judgment on the merits on an action for money damages. Pending a decision on the Writ of Prohibition, PCI did not resume parking at the Cherrick Lot because it was unsure when the TRO would be implemented.

On February 8, 2006, this Court denied the Writ of Prohibition, holding that pursuant to 11 U.S.C. § 157, the Bankruptcy Court did have subject matter jurisdiction to grant injunctive relief because Columbia Sussex's actions in raising rates could have a conceivable effect on the administration of the bankruptcy estate. *In re Columbia Sussex Corp. Inc.*, No. 4:06CV118SNL, 2006 WL 305959 (E.D. Mo. Feb. 8, 2006).

On February 10, 2008, the TRO went into effect. On the same day PCI

- 7 -

resumed parking at the Cherrick Lot.

On February 16, 2006, the Bankruptcy Court converted the TRO into a preliminary injunction, enjoining Columbia Sussex from charging more than $1.50 per vehicle for validated parking tickets for casino patrons. In granting preliminary injunctive relief the Bankruptcy Court found that: (1) PCI was likely to succeed on the merits of its *prima facie* tort claim; (2) PCI would suffer irreparable harm by loss of use of the Cherrick Lot which would have a detrimental effect on Debtors' operations and reorganization; (3) the harm to PCI outweighed any loss to Columbia Sussex, "particularly in light of the fact that Defendants are operating the lot at a loss"; and (4) public safety was promoted if casino patrons could use validated parking at the Cherrick Lot rather than alternatives that were more distant and potentially more hazardous.

On March 5, 2007, PCI filed a motion for summary judgment on all counts in the Complaint and all counterclaims in the Answer. On the same date, Columbia Sussex filed a cross-motion for summary judgment on all counts and counterclaims. On December 27, 2007, the Bankruptcy Court entered an order granting summary judgment to PCI on the *prima facie* tort claim.

In granting summary judgment to PCI, the Bankruptcy Court determined that Columbia Sussex had a legal right to increase rates; that it increased rates to

pressure PCI from filing a breach of contract action; and that such action demonstrated actual malice on the part of Columbia Sussex. Finally, the Court concluded that Columbia Sussex's contention that it raised rates to earn a better return on their investment was not reasonable in light of the fact that Columbia Sussex lost money due to the rate increases.

## CONCLUSIONS OF LAW

This Court has jurisdiction to hear appeals of the Bankruptcy Court's final and interlocutory orders pursuant to 28 U.S.C. § 15 8(a). This Court reviews the Bankruptcy's Court's grant of summary judgment in PCI's favor *de novo*. *In re Temporomandibular Joint Implants Prods. Liab. Litig*., 113 F.3d 1484, 1492 (8th Cir. 1997). A grant of summary judgment will be upheld if: (1) there are no genuine issues of material fact; and (2) the movant is entitled to judgment as a matter of law. *Id*. In making this determination, the facts are viewed in the light most favorable to the party against whom judgment was entered. *Id*.

Missouri has long recognized a cause of action for *prima facie* tort. *Porter v. Crawford & Co*., 611 S.W.2d 265, 268 (Mo. Ct. App. 1980). Despite repeated challenges to its viability, *prima facie* tort remains a tort recognized in Missouri as necessary to provide a remedy for tortious conduct that does not fit under any traditional theories. *Gary Surdyke Yamaha Inc. v. Donelson*, 743 S.W.2d 522, 525

(Mo. Ct. App. 1987) (refusing to opine on the viability of the *prima facie* tort claim because "our intermediate courts of appeal have accepted the prima facie tort" claim); *Reed v. Rolla 31 Public Sch. Dist.*, 374 F. Supp. 2d 787, 812 (E.D. Mo. 2005) ("The tort is recognized in those cases in which it is necessary for the courts to respond to the needs of society and to provide equity when a party has no other tort remedy") (internal quotations omitted); *Killion v. Bank Midwest N.A.*, 987 S.W.2d 801, 812-13 (Mo. Ct. App. 1998)(recognizing the *prima facie* tort doctrine as a valid cause of action in Missouri).

Under Missouri law, in order to recover for *prima facie* tort, a plaintiff must show: (1) an intentional lawful act by defendant; (2) defendant's intent to injure plaintiff; (3) an absence of justification or an insufficient justification for defendant's act; and (4) injury to plaintiff. *Porter v. Crawford & Co.*, 611 S.W.2d at 268. If the Court finds that there is any validity to the justification asserted by the defendants, the Court will perform an additional step and "balance []the bad motivation of the defendant against the claimed justification for the act" to determine if the act was tortious. *Killion*, 987 S.W.2d at 808.

The parties do not dispute that Columbia Sussex, as the owner of the Cherrick Lot; had a legal right to raise validated parking rates. Thus the first element is satisfied. The second element, a defendant's intent to injure, requires a

specific, clear-cut intent to injure plaintiff, not just an actual intent to perform an act that results in injury. *Luneburg v. Prudential Ins. Co. of Am.*, 661 S.W.2d 667,670 (Mo. Ct. App. 1983). Under Missouri law, statements that express a desire to retaliate or punish a plaintiff constitute sufficient evidence of the intent to injure requirement *Killion*, 987 S.W.2d at 811-12; *Porter*, 611 S.W.2d at 273. Similarly, raising rates to usurious levels, as retribution for refusing a defendant's demands to resolve a dispute is evidence of an actual intent to injure. *Killion*, 987 S.W.2d at 81 1-12.

In the present case, William Yung told John Ayisworth that if President Casino did not drop the breach of contract suit "he would just take that parking lot away and chain it up." When asked about these remarks, Yung explained that he wanted to retaliate against PCI for what he perceived were threats to bring a breach of contract suit. Then, on the heels of these remarks, Columbia Sussex, with just eight hours notice to the President Casino, without any research into appropriate market rates for validated parking, raised rates 300 percent, from $1.50 to $6.00. According to Columbia Sussex's own expert, a parking lot operator waits at least 30 to 60 days after a rate increase to test and see if the rate increase is reasonable. However, within five days of its first rate increase, Columbia Sussex again raised rates, another 260 percent, from $6.00 to $10.00 until

the President Casino, unable to pay the higher rates was forced to find alternate parking.

When confronted with a similar set of facts, the court in *Killion* found malice and an actual intent to injure. *Killion* 987 S.W.2d at 811-812. In *Killion*, plaintiff borrowers were late in making their loan payments to defendant bank. The defendant bank, in exchange for allowing plaintiffs to make late loan payments, increased the interest rates much higher than those originally agreed to in the promissory note. Eventually, a dispute arose amongst the parties about the interpretation of an interest provision in the note, and plaintiffs informed defendants of their intent to contest the enforceability of that provision. Defendants submitted a modified agreement to plaintiffs clarifying the interest provision and, when plaintiffs refused to sign the modified agreement, defendants instituted a foreclosure action. Plaintiffs obtained a temporary restraining order to halt the foreclosure auction. When served with the temporary restraining order, the bank's attorney stated that though the sale was off today, "there will be a sale. This farm will sell." *Id*. at 807.

The court found that the institution of the foreclosure action, though legal, was retribution for failing to signed the amended agreement. The court concluded that the foreclosure action, the comments by the bank attorney that "there will be a sale. This farm will sell" and the imposition of usurious interest rates were all

evidence of an actual intent to injure plaintiffs. *Id*. at 811-12.

Killion is directly analogous to the present case. In both cases there was a dispute and a refusal to settle on the part of the injured party and in both cases there was the imposition of increased rates as retribution. In addition, the statements expressing an intent to retaliate are analogous in both cases and in fact the bank attorney's statements in *Killion* are benign compared to William Yung's threat to "take that parking lot away and chain it up." Thus, the undisputed facts establish that Columbia Sussex acted with a malicious intent to injure PCI.

The third element is an absence of justification for defendant's act. Columbia Sussex asserts that it had sufficient economic justification to avoid the imposition of liability for two reasons: (1) it wanted to get a market return on its investment; and (2) it wanted to gain leverage over PCI in settlement negotiations. Columbia Sussex's assertions are unsupported by any evidence. The undisputed evidence shows that raising the parking validation rates 560 percent in five days had the exact opposite economic effect — Columbia Sussex lost money.

The results of the rate increase belie Columbia Sussex's assertion of economic motive. In the month of January 2006, the volume of cars parking at the Cherrick Lot dropped from 40,000 a month to 645 and Columbia Sussex went from making half a million dollars in rental income a year to facing substantial declining

revenues from the parking lot.  Nevertheless it did not decrease rates or seek to negotiate a new rate with PCI.

Columbia Sussex conducted no research or studies to determine whether validated parking rates at the Cherrick Lot were undermarket, either before the first or the second rate increase.  St Louis Parking, with more than 23 years experience, operating over 120 parking garages in the Cherrick Lot vicinity, advised Columbia Sussex not to raise validated parking rates to $6.00.  Validated parking rates in the Cherrick Lot area were between $1.33 and $2.00.[1]  Columbia Sussex's expert also opined that a parking operator generally waits at least 30 to 60 days after a rate increase to determine whether the rate increase was successful.  Yet, Columbia Sussex waited a mere five days before raising rates another 260 percent.

Columbia Sussex does not dispute any of this evidence.  Instead, the only evidence that Columbia Sussex proffers in support of its claim that validation rates

---

[1] There is no support in the record for the statement by Columbia Sussex that the validated parking rates at the Cherrick Lot were undermarket.  Mr. Mollish conducted a survey of the parking lots in the vicinity of the Cherrick Lot and determined that validated parking rates in the area were between $1.33 and $2.00. Furthermore, Mr. Mollish's survey confirmed that a $10.00 parking rate was applicable in only three instances in the non-validation context:  maximum hourly rates for whole day parking; weekend and holiday parking; and in the event of a lost ticket.  Even in those instances, the $10.00 rate was applied only 12.5 percent of the time.

at the Cherrick Lot were undermarket is the argument that it paid $5 million for the Cherrick Lot and, therefore, had a legal right to raise rates. However, something more than a valid legal right is required to establish a valid justification. Indeed, one of the elements of a *prima facie* tort is that the action was legal in the first instance. *Porter,* 611 S.W.2d at 273.(rejecting defendant's argument that a valid justification for defendant's actions was his statutory right to stop payment on the check because "[it is not the exercise of the lawful right to stop payment which creates the tort" but an "act [] done with intent to injure and without justification"); *LPP Mortgage, Ltd. v. Marcin, Inc.*, 224 S.W.3d 50, 55 (Mo. Ct. App. 2007)("Because every claim of prima facie tort is predicated on the intentional commission of a lawful act, a mere legal right to perform that act is not enough to defeat the claim.")

While wanting to get a higher return on one's investment is certainly a valid economic motive, in this case all of Columbia Sussex's actions belie that assertion. Raising the rates was reckless and clearly not calculated to make a higher return on the parking lot. It was done in the face of adverse advice from the lot operators, without any prior study and when Columbia Sussex was faced with the devastating economic results of its action, a virtual halt to its business, it persisted in maintaining the artificially high rates. Columbia Sussex made it very clear that its real motive was a desire to extract retribution from PCI, not to make more money.

The second justification proffered by Columbia Sussex for raising parking validation rates 560 percent is that it wanted to gain leverage over PCI in settlement negotiations. However, there is simply no evidence to support Columbia Sussex's alleged motive. Columbia Sussex was told by PCI that raising rates would end all settlement negotiations. But Columbia Sussex raised the rates nonetheless, resulting in the termination of all settlement talks. There is no evidence that Columbia Sussex tried to restart negotiations and in fact, after settlement negotiations ended, Columbia Sussex raised rates again from $6.00 to $10.00. The undisputed evidence establishes that Columbia Sussex acted without any economic justification.[2]

---

[2] Because the Court has determined that Columbi Sussex has acted absent economic justification, the Court need not perform the balancing test of balancing Columbia Sussex's bad motivation against its claimed justification. Even assuming the need for the balancing test, Columbia Sussex's argued justification is outweighed by it's true motivation:
In balancing Columbia Sussex's bad motivation against its claimed justification, the Court must consider four factors: (1) the nature and seriousness of the harm; (2) the interests promoted by the actor's conduct; (3) the character of the means used by the actor; and (4) the actor's motive. *Chaffered v. City Fed. Say. & Loan Ass'n,* 729 S.W.2d 510,518 (Mo. Ct. App. 1987). All four factors favor judgment for PCL. Under the first factor, although physical harm to person and property weighs most heavily, "severity of harm suffered is an important consideration in every case, and a serious harm to an interest less deserving of protection may be a more important factor in finding liability than a slighter harm to a more significant interest" *Killion*, 987 S.W.2d at 808.
    In the present case, there was both physical harm to persons and property and severe pecuniary harm to PCL. Columbia Sussex's actions forced casino patrons to park in "distant and potentially more hazardous places" such as the levee on the Mississippi River. The Court agrees with the Bankruptcy Court that such harm resulted in a loss to public interest and safety and is precisely the kind of harm circumscribed by the first factor of the balancing test. Furthermore, by threatening the very viability of the President Casino and by threatening to disrupt PCI's reorganization efforts, Columbia Sussex inflicted the most severe pecuniary harm on

The fourth element injury to plaintiff, also has been satisfied by PCI.  As a

_____

PCI.  In a  two month period of time, PCI had to expend $382,884 on parking alone.  As a result, the money available for distribution to creditors of the bankruptcy estate was considerably lessened.  Such severe pecuniary harm weighs heavily towards a finding of liability for Columbia Sussex.

The second factor, whether any legitimate interests were promoted by the rate increases, also weighs in PCI's favor.  The effect of the rate increase on Columbia Sussex was a decline in revenues and the failure of all settlement negotiations.  The rate increase also had the effect of disrupting the reorganization efforts of PCI and causing it severe pecuniary harm.  The Court finds that there were no legitimate interests promoted by Columbia Sussex's rate increases.

On the third factor, the character of the means used by the actor, the Court considers whether there is conduct that offends concepts of social fairness and morality.  Although Columbia Sussex had a legal right to raise rates, the manner in which it did so exhibits a high degree of maliciousness.  Columbia Sussex raised rates from $1.50 to $6.00 on only eight hours notice and then five days later raised rates to $10.00 on similarly short notice, without any concern for the adverse economic impact its actions were having on its own investment.  Columbia Sussex was also unconcerned that its actions threatened the public interest and safety by forcing casino patrons to park at more distant and potentially hazardous places.  This factor weighs in favor of PCL

On the fourth factor, the degree of malice exhibited by Columbia Sussex, as the Court has already noted above, the undisputed facts establish that Columbia Sussex's actions were motivated by a high degree of malice. The imposition of a 560 percent rate increase by Columbia Sussex within just five days, the comments by William Yung to Aylsworth that Columbia Sussex would take the Cherrick Lot away and chain it up, the decline in Columbia Sussex's parking lot revenue due to the rate increases and the utter absence of any research or studies to determine how much to raise rates all support a finding that Columbia Sussex was motivated by a high degree of malice in raising rates.  This factor also favors liability for Columbia Sussex.

In summary, Columbia Sussex's actions caused physical harm to the persons and property of casino patrons and serious harm to the reorganization efforts of PCL.  There were no legitimate interests protected by the rate increases and in fact they resulted in declining revenues for Columbia Sussex.  Further, in increasing rates first 300 percent with eight hours notice and then within five days, another 260 percent with similarly short notice without any concern for either their own economic advantage or for the safety of casino patrons, Columbia Sussex was motivated by a desire to punish PCI for threatening to bring a breach of contract suit.  The application of the balancing of interests test to the facts of this case indicates that Columbia Sussex's conduct was tortious.

direct result of Columbia Sussex's actions, from December 16, 2005 to December 22, 2005, the President Casino paid $106,766 in fees associated with the raised validation rates.  In addition, from December 31, 2005 to February 9,2006, the President Casino paid an additional $276,118 in costs associated with providing alternate parking to casino patrons denied access to the Cherrick Lot.  Thus, PCI suffered damages in the amount of $382,884.

The Bankruptcy Court's grant of summary judgment to PCI on the *prima facie* tort claim should be affirmed.

Columbia Sussex asserts that under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Bankruptcy Court did not have jurisdiction to grant injunctive relief. Columbia Sussex's jurisdictional challenge fails for two reasons: (1) Columbia Sussex has already appealed to this Court and lost on this very issue and is precluded from raising this issue again based on the doctrine of law of the case; and (2) as a substantive matter, *Grupo Mexicano* is inapplicable in this case because it specifically exempts from its holding cases where, as here, jurisdiction is statutorily conferred.  On February 8, 2006, this Court denied Columbia Sussex's Writ of Prohibition holding that, pursuant to 28 U.S.C. § 157, the Bankruptcy Court had jurisdiction to grant injunctive relief because Columbia Sussex's actions could conceivably have an effect on the

bankruptcy estate. *In re Columbia Sussex Corp., Inc.*, No. 4:O6CV118SNL, 2006 WL 305959 (E.D. Mo. Feb. 8, 2006). Further, this Court held that the decision in *Grupo Mexicano* was inapplicable in this case because *Grupo Mexicano* specifically exempted from its holding cases where, as here, jurisdiction is statutorily conferred. *Id*. at * 4.

Under Eighth Circuit law, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988); *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995) ("[A] decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice.") (internal quotations omitted).

Columbia Sussex has presented neither any new evidence, nor any arguments establishing that the prior decision of this Court relied on clearly erroneous facts. Nor has there been any subsequent change in the governing law to warrant reconsideration of this issue in the present appeal. To allow Columbia Sussex yet another opportunity to appeal this issue would completely undercut the policies underlying the doctrine of law of the case.

Moreover, in *Grupo Mexicano*, the Supreme Court addressed whether district

courts had the equitable power to enjoin a Mexican company from distributing or transferring its assets so that the assets would be available to satisfy a potential judgment for money damages. The Court held that the equitable power of federal courts did not include an injunction preventing the defendants from disposing of assets so that the assets would be available to satisfy a potential judgment on a claim for damages. *Grupo Mexicano*, 527 U.S. at 333. However, the Court specifically exempted from its holding cases where jurisdiction to issue such injunctions is conferred, as here, by statute. *Id.* at 325-26. Pursuant to 28 U.S.C. § 157(a), a bankruptcy court may exercise jurisdiction over any claim that has a "conceivable effect" on the bankruptcy estate being administered by that court. An action could have a "conceivable effect" on the bankruptcy estate if it could alter the debtor's rights, liabilities, options or freedom of action and which in any way impacts the handling and administration of the bankruptcy estate. *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 774 (8th Cir. 1995). In addition, pursuant to 11 U.S.C. § 105(a), a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

The Bankruptcy Court found that paying higher validation fees resulted in the decrease of funds available to PCI's bankrupt estate, disrupting PCI's reorganization efforts and the Court's administration of that estate. Columbia

Sussex has presented no evidence that this finding by the Bankruptcy Court was clearly erroneous.

Columbia Sussex argues that even if the Bankruptcy Court had jurisdiction, it erred in granting the preliminary injunction order. Thus, Columbia Sussex is entitled to relief only if the Bankruptcy Court's grant of a preliminary injunction was an abuse of discretion. *PCTV Gold Inc. v. S'peedNet, LLC*, 508 F.3d 1137, 1142 (8th Cir. 2007). Only if the Bankruptcy Court's decision rested upon clearly erroneous findings of fact or on clearly erroneous legal conclusions will this Court disturb the result. *Id.*

The Bankruptcy Court's order granting preliminary injunctive relief to PCI is affirmed.

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981).

*Vonage Holdings Corp. v. Nebraska Public Service Com'n* 564 F.3d 900, 904 (8th Cir. 2009).

On the first factor, Columbia Sussex argues that there was no irreparable harm because PCI's damages were purely monetary. This ignores the Bankruptcy

Court's findings, based on undisputed facts, that Columbia Sussex's actions, in addition to causing the President Casino monetary harm, hindered the reorganization of the bankruptcy estate and resulted in harm to the public safety by forcing casino patrons to park in unsafe locations.

Regarding the second factor, weighing the potential harm to PCI against the potential harm to Columbia Sussex from the preliminary injunction, the Bankruptcy Court correctly found that Columbia Sussex's conduct harmed PCI's reorganization efforts, the President Casino's business operations and casino patrons' safety. In contrast, while the preliminary injunction would interfere with Columbia Sussex's private property interests, it would also stem Columbia Sussex's continued losses from the rate increase. The Bankruptcy Court correctly held that the harm to PCI outweighed any harm to Columbia Sussex from the grant of the preliminary injunction.

With respect to the third factor, PCI's likelihood of success on the merits of the *prima facie* tort claim, PCI adequately pled and proved all elements of *prima facie* tort. Specifically, PCI showed that in raising validation rates over 560 percent, without prior notice, with knowledge that its actions would threaten the viability of casino operations, and without any knowledge of market rates, Columbia Sussex acted with intent to injure PCI and with inadequate justification.

On the fourth factor, this Court declines to disturb the Bankruptcy Court's finding that by forcing casino patrons to park in unsafe locations, Columbia Sussex's actions harmed the public interest. An analysis of all four factors under the preliminary injunction standard leads to the conclusion that the Bankruptcy Court did not abuse its discretion in granting PCI a preliminary injunction.

## CONCLUSION

Based upon the foregoing, the Bankruptcy Court Order granting summary judgment to PCI on its *prima facie* tort claim was proper.

Accordingly,

**IT IS HEREBY ORDERED** that the Bankruptcy Court Order granting summary judgment in favor of PCI and against Columbia Sussex on PCI's *prima facie* tort claim is affirmed.

**IT IS FURTHER ORDERED** that PCI is awarded damages in the amount of $382,884.

**IT IS FURTHER ORDERED** that The Bankruptcy Court Order granting preliminary injunctive relief to PCI is affirmed.

Dated this 25th day of September, 2009.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE